# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| ERNEST J. GLYNN, et al.,       ) | |
|       ) | |
|     Plaintiffs,     ) | |
|       ) | |
| v.       ) | Docket No. 2:19-cv-00176-NT |
|       ) | |
| MAINE OXY-ACETYLENE SUPPLY   ) | |
| CO., et al.,     ) | |
|       ) | |
|     Defendants.     ) | |

## ORDER ON PLAINTIFFS' MOTION TO CERTIFY CLASS

This matter comes before me on the Plaintiffs' motion to certify a class pursuant to Federal Rule of Civil Procedure 23. Pls.' Mot. for Class Cert. ("**Pls.' Mot.**") (ECF No. 38). For the reasons that follow, I **GRANT** the Plaintiffs' motion.

## BACKGROUND

This case concerns a dispute surrounding an employee stock ownership plan ("**ESOP**") at Maine Oxy-Acetylene Supply Company ("**Maine Oxy**"), a supplier of welding equipment and industrial and specialty gases at retail locations across New England. Second Amended Compl. ("**SAC**") ¶¶ 1, 12 (ECF No. 52). In 2004, the Albiston family, the sole shareholders of Maine Oxy, established the ESOP to allow employees to "share in the growth and profits of [Maine Oxy] and to enable them to save and invest in accordance with the" ESOP. SAC ¶ 13; Maine Oxy ESOP Document § 1.2 (ECF No. 46-6). Atlantic Management Co. ("**Atlantic**") conducted the annual valuation of the shares held by the ESOP. Daniel Guerin Decl. ("**Guerin Decl.**") ¶ 7 (ECF No. 46-1).

In the first two years of the ESOP's existence, Bruce Albiston sold forty-nine percent of Maine Oxy's stock to the ESOP, while Bruce and his son Joseph retained the remaining fifty-one percent. SAC ¶¶ 14–16; Defs.' Answer ¶¶ 14–16 (ECF No. 58). In 2012, Defendants Daniel Guerin and Bryan Gentry purchased Bruce and Joseph's fifty-one percent stake for $654.62 per share. SAC ¶¶ 20–23; Defs.' Resps. to Pls.' Req. for Produc. of Docs. 3 (ECF No. 38-1). In 2013, the Defendants terminated the ESOP and reacquired the forty-nine percent of the stock that the ESOP had owned at a rate of $134.92 per share. SAC ¶¶ 1, 42–43, 47, 53, 56; Defs.' Resps. to Pls.' Req. for Produc. of Docs. 3.

The Plaintiffs—Ernest Glynn, Jeffrey MacDonald, Doug Johnson, and Joshua Richardson—are four former employees of Maine Oxy, who participated in the company's ESOP. SAC ¶¶ 2–5; Reply Mem. in Support of Pls.' Mot. for Class Cert. 5 (ECF No. 53). The Plaintiffs allege that the Defendants did not inform them of the price at which they were repurchasing the company's shares or the number of shares each employee owned. Decl. of Ernest Glynn ("**Glynn Decl.**") ¶ 9 (ECF No. 53-1). The only information that they received was the amount of their lump sum payout. Glynn Decl. ¶ 9. The Plaintiffs also allege that they were unaware of the price per share that Guerin and Gentry had paid to acquire the majority of the company in 2012. Glynn Decl. ¶¶ 7–8.

The Plaintiffs filed this lawsuit in April of 2019 alleging that the Defendants violated the Employee Retirement Income Security Act ("**ERISA**"), 29 U.S.C. §§ 1101 et seq. Class Action Compl. ("**Compl.**") (ECF No. 1). The Defendants filed a partial

2

motion for judgment on the pleadings (ECF No. 21), arguing that the Plaintiffs could not seek punitive damages under ERISA. In their response to the motion (ECF No. 25), the Plaintiffs conceded that the Defendants were correct and filed their First Amended Complaint ("**FAC**") (ECF No. 24). Thereafter, the Plaintiffs moved for leave to file the SAC (ECF No. 37). Over the Defendants' objections (ECF No. 42), the Court granted the Plaintiffs leave to file the SAC (ECF No. 49), which is now the operative Complaint. Finally, the Plaintiffs filed the pending motion to certify a class defined as follows: "All Maine Oxy employees who participated in the company ESOP and who sold their shares back to Maine Oxy after [the Albistons] sold [their] 51% interest in the company." Pls.' Mot. 3

The SAC alleges that Defendants Maine Oxy, Guerin, and Gentry breached the fiduciary duties that they owed to ESOP participants under 29 U.S.C. §§ 1132(a) (Counts I, II, and VIII), 1106 (Count III), 1109 (Counts IV and IX), and 404(a)(1) (Counts V, VI, and VII).

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions. The rule provides that an individual must meet certain conditions to sue in a representative capacity. First, the party moving for class certification must demonstrate the four following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

3

Fed. R. Civ. P. 23(a). These prerequisites are frequently referred to as the numerosity, commonality, typicality, and adequate representation requirements.

A named plaintiff who establishes the prerequisites must then show that the class is maintainable under one of the types of class actions described in Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). A class may be certified under Rule 23(b)(1) where:

> prosecuting separate actions by or against individual class members would create a risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests . . . .

Fed. R. Civ. P. 23(b)(1). A class action may be maintained under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." *Id.* 23(b)(2). And Rule 23(b)(3) allows a class action when "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b)(3). The Plaintiffs contend that they satisfy the requirements of each of the types of classes certifiable under Rule 23(b). Pls.' Mot. 8–15; Pls.' Supp. Filing in Support of Motion for Class Cert. ("**Pls.' Supp. Brief**") (ECF No. 63).

## DISCUSSION

The Defendants contend that the Plaintiffs fail to establish the typicality and adequacy of representation requirements and that the Plaintiffs' proposed class cannot be certified under any of the provisions of Rule 23(b). Defs.' Opp'n to Pls.' Class Cert. Mot. ("**Defs.' Opp'n**") (ECF No. 46); Defs.' Supp. Brief Opposing Class Cert. ("**Defs.' Supp. Opp'n**") (ECF No. 65). Because the Plaintiff must first establish the Rule 23(a) prerequisites, Rule 23(a) is where I begin.

### I.    Rule 23(a)

#### A.    Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Rule 23(a)(1) does not dictate a strict numerical threshold for class certification, but courts in this circuit have generally found that a class of forty or more individuals satisfies numerosity. *See, e.g.*, *Coffin v. Bowater, Inc.*, 228 F.R.D. 397, 402 (D. Me. 2005). Here, the Plaintiffs estimate that their proposed class exceeds 100 members, and the Defendants do not contest numerosity. SAC ¶ 62; Defs.' Opp'n 4. Thus, I conclude that the numerosity prerequisite is met.

#### B.    Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Defendants do not contest commonality, and I conclude that this prerequisite is met because the allegation that the Defendants breached their fiduciary duties by paying class members less than fair value for their stock is an issue common to all class members. *See Hochstadt v. Bos. Sci. Corp.*, 708 F. Supp. 2d 95, 102–03 (D. Mass. 2010) (common questions for purposes of Rule

5

23(a)(2) included "Defendants' alleged breaches of fiduciary duties under ERISA"); *see also Banyai v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y. 2002) ("In general, the question of defendants' liability for ERISA violations is common to all class members because a breach of a fiduciary duty affects all participants and beneficiaries.").

### C.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied when the representative plaintiffs' "injuries arise from the same events or course of conduct as do the injuries of the class and when plaintiff[s'] claims and those of the class are based on the same legal theory." *Campbell v. First Am. Title Ins. Co.*, 269 F.R.D. 68, 75 (D. Me. 2010) (quoting *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008)). Typicality "mandate[s] only that complainants' claims be common, and not in conflict, but not necessarily identical." *Rancourt v. Concannon*, 207 F.R.D. 14, 16 (D. Me. 2002). The purpose of this prerequisite is to "align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *In re Bos. Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 282 (D. Mass. 2009).

The named Plaintiffs allege that the Defendants forced them to sell their shares back to the company at a price significantly below market value. The class members are alleged to have suffered the same injury. The named Plaintiffs' legal theory is the same legal theory as for the rest of the class. *See In re One Bancorp Sec. Litig.*, 136 F.R.D. 526, 530 (D. Me. 1991) (typicality requirement satisfied because

named plaintiffs' claims "arise from the same series of events and are based on the same legal theories as the claims of all class members").

The Defendants mount a two-pronged challenge to the typicality requirement, contending that the named Plaintiffs assert claims that are not shared by the class and are subject to defenses not shared by the class. With regard to their contention that the named Plaintiffs assert different claims, the Defendants argue that the Plaintiffs' allegations[1] "focus[]" on the improper actions taken by the Defendants against unnamed Maine Oxy employees, who turned out (after class certification discovery) to be mostly just the named Plaintiffs. Defs.' Opp'n. 6–7; Peter Brann Decl.

---

[1]     At the time that the Defendants filed their opposition to the motion to certify the class, the operative complaint was the First Amended Complaint ("**FAC**"). The Defendants cite without discussion a number of paragraphs in the FAC containing allegations of improper actions taken by the Defendants against unnamed employees. *See* Defs,' Opp'n to Pls.' Class Cert. Mot. ("**Defs.' Opp'n**") 6 (ECF No. 46) (citing FAC ¶¶ 23, 24, 36–38, 43–46, 48, 52, 53, 60(c)). These same allegations are contained in the Second Amended Complaint ("**SAC**"). *See* SAC ¶ 25 ("When ESOP participants inquired of Mr. Guerin, they were told that the sale price was confidential and that they were not to ask about the sale price again."); ¶ 26 ("Mr. Guerin . . . assured Maine Oxy's employees that 'nothing would change' with the ESOP and profit-sharing plan. Despite this assurance, he immediately set about making substantial changes. . . ."); ¶¶ 38–39 ("The company hired by Maine Oxy to set up the new 401k [sic] plan . . . was queried by at least one employee as to what . . . other options were available" and "was informed that the only option was to sign over the stock . . . ."); ¶ 40 ("Employees were concerned that their ability to participate in the new 401(k) would be foreclosed or that they would be ineligible for an employer match if they did not exercise one of the options presented by the company within the thirty day deadline."); ¶ 46 ("Several Maine Oxy employees initially refused to avail themselves of the opportunity to sell the stock back to the company and resisted the forced buyback."); ¶ 47 ("Deliberately using false and misleading measures, Defendant Guerin played an active and effective role in forcing owner-employees to sell their shares back to the company."); ¶ 48 ("Defendant Guerin informed several owner-employees that the company could not afford the ESOP plan and remain an independent company."); ¶ 49 ("Defendant Guerin also stated that the value of the company was 'frozen' and would 'not go back up.' "); ¶ 51 ("Holdouts to the 'opportunity' were subject to threats, intimidation, and harassment."); ¶ 57 ("In May or June of 2016 . . . Mr. Bruce Albiston revealed that [he] had received 43 million dollars for his 51% share of the company. This was the first time that any of the ESOP participants learned that they may have unwittingly sold their shares back to the company at a steep discount."); ¶ 58 ("During the summer of 2016, Bryan Gentry's son . . . told one or more employees that his father had paid 43 million dollars for Mr. Albiston's 51% share."); and ¶ 66(c) (pleading that a question common to the class is whether the "Defendants deliberately and unlawfully misled, defrauded and/or otherwise coerced its ESOP participants into selling their shares back to the company at $134 . . . a share for the 24,500 minority interest shares—approximately 3.3 million dollars in total").

¶ 11 (ECF No. 46-2) ("[A]ll of the named Plaintiffs assert that Defendants acted improperly towards them in ways that are not asserted on behalf of the absent class members.").

The Defendants mischaracterize the Plaintiffs' "focus." From the start of this litigation, the Plaintiffs have asserted that the Defendants violated their fiduciary duties under ERISA and have indicated that their case revolves around the establishment of the ESOP, "the subsequent acquisition of 49% of the company by its employees," and the Defendants' allegedly "unlawful efforts to repurchase the shares for a fraction of their value." Compl. ¶ 1; *accord* FAC ¶ 1; SAC ¶ 1. When seen in proper perspective, the named Plaintiffs are asserting claims typical of the rest of the class—that is, that the Defendants violated their fiduciary duties under ERISA by not paying participants fair market value for their shares. The fact that the SAC contains additional specific allegations of misconduct against the named Plaintiffs does not destroy typicality. Rather, these instances of misconduct simply provide additional factual allegations in support of the underlying breach of fiduciary duty claims. Typicality is satisfied where the named plaintiffs and the class seek recovery "based on the same legal theory," as here they do. *See Campbell*, 269 F.R.D. at 75; *Rancourt*, 207 F.R.D. at 16 (noting that typicality requires lack of conflict between claims, not that claims are identical).

The Defendants also argue that the Plaintiffs cannot satisfy the typicality requirement because two of the four named plaintiffs are subject to unique defenses. Defs.' Opp'n 7–10. Named plaintiffs cannot be "considered typical of the class" if they

are "subject to unique defenses that would divert attention from the common claims of the class." *Swack v. Credit Suisse First Bos.*, 230 F.R.D. 250, 260 (D. Mass. 2005). But the mere existence of unique defenses is not enough to defeat typicality. Rather, the unique defense must "threaten to become the focus of the litigation." *DeRosa v. Mass. Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 100 (D. Mass. 2010) (internal quotations omitted); *Swack*, 230 F.R.D. at 260.

The Defendants assert that Plaintiffs Ernest Glynn and Doug Johnson would be subject to unique defenses because of Mr. Glynn's former role as an ESOP trustee and Mr. Johnson's 2011 departure from Maine Oxy. Mr. Glynn served as a trustee of the ESOP for four years, but he concluded his term before Atlantic's 2012 valuation and before the Albistons sold their shares. Defs.' Sur-Reply in Opp'n to Pls.' Class Cert. Mot. ("**Defs.' Sur-Reply**") 2 (ECF No. 57) (citing Glynn Decl. ¶ 3). As trustee, Mr. Glynn received annual reports from Atlantic about the value of the ESOP. Glynn Decl. ¶ 5. The Defendants suggest that they relied on Atlantic's valuation in setting the stock price for the 2013 re-acquisition of stock from the ESOP and that Mr. Glynn, as a former trustee of the ESOP, had also relied upon Atlantic's valuations when he served as trustee. Defs.' Sur-Reply 2. According to the Defendants, this "places [Mr. Glynn] on the horns of a dilemma" because he either violated his own fiduciary duties by not carefully reviewing the 2010 and 2011 valuations or he did carefully review them and found them appropriate, making his criticism of the 2012 valuation disingenuous. Defs.' Opp'n 8–9. But the Defendants do not explain how earlier actions by prior fiduciaries are a defense to the central claim of the class in this litigation,

namely that the Defendants breached their fiduciary duties in undervaluing the Maine Oxy stock held by the ESOP when they reacquired it in 2013. Nor do the Defendants explain how Mr. Glynn's reliance on those earlier valuations represents a unique defense that would "divert attention from the common claims of the class."[2] *See Swack*, 230 F.R.D. at 260.

Plaintiff Doug Johnson left his job at Maine Oxy in 2011, and the Defendants argue that because he was a former employee—rather than a current employee—when he sold his ESOP shares in 2013, he does not fall within the class definition. Defs.' Opp'n 9. The Plaintiffs have defined their proposed class as "[a]ll Maine Oxy employees who participated in the company ESOP and who sold their shares back to Maine Oxy" during the stock buyback. Pls.' Mot. 3; SAC ¶ 64. That means that the class definition encompasses all those who 1) were Maine Oxy employees, 2) participated in the company ESOP, and 3) sold their shares back to Maine Oxy during the buyback. Mr. Johnson checks all three boxes. I thus do not understand Defendants' contention that he does not fall within the Plaintiffs' class definition.

The Defendants also argue that Mr. Johnson's claims are not typical of the class because he should have sold his shares in 2011 when he left Maine Oxy's employ and thus does not have standing to challenge the 2012 valuation. Defs.' Opp'n 9–10.

---

[2]       The Defendants argue that "the history of Atlantic's independent, expert valuations lies at the heart of any dispute over the value of the Maine Oxy ESOP shares" because the "2012 valuation was in the same ballpark as—and indeed higher than—Atlantic's valuations for 2010 and 2011." Defs.' Opp'n 8. But this argument ignores that valuations are based on many factors that can change from year to year. And even if that valuation history is relevant, the Defendants do not explain how it represents a unique defense against Mr. Glynn that would cause the litigation to be sidetracked by issues not important to the claims of the class as a whole.

This argument is purportedly based on Section 11 of the Maine Oxy ESOP documents under which the Defendants say Mr. Johnson was supposed to have immediately redeemed his shares upon departure from the company. Guerin Decl. ¶ 18. However, as the Plaintiffs point out, Section 11 allows ESOP participants with vested balances exceeding $5,000 to defer distribution until they reach retirement age. *See* Maine Oxy ESOP Document §§ 11.2(c), (e), 11.4.[3] Mr. Johnson had a vested balance exceeding $5,000 at the time of his departure. ECF No. 53-3. The Defendants offer no support for their contention that Mr. Johnson was required to have redeemed his shares in 2011 beyond their say-so. Because it appears that Mr. Johnson was entitled to retain his shares, he has standing to challenge the 2012 valuation, and his claims are typical of the class he seeks to represent.

### D.   Adequacy

The Defendants argue that neither the named Plaintiffs nor proposed class counsel can adequately represent the interests of the members of the putative class. Specifically, the Defendants argue that the named Plaintiffs have conflicts of interest

---

[3]     After separation of service, ESOP participants "may elect" to liquidate the vested balance of the account. Maine Oxy ESOP Document § 11.2(c) (ECF No. 46-6). The Defendants do not identify a portion of Section 11 that indicates that departing participants *must* so liquidate. In addition, multiple parts of Section 11.4 of the ESOP documents contemplate retention of a former employee's interest until retirement. *See id.* § 11.4(b)(iii) ("[P]ayment of benefits shall commence no later than 60 days after the end of the Plan Year in which occurs the latest of the Participant's Normal Retirement Age, severance from employment with the Employer[,] or the 10th anniversary of the date on which the Participant commenced participation in the Plan."); *id.* § 11.4(b)(iv) ("After a Participant's separation from service with the Employer, his Accounts shall continue to be invested as part of the Trust Fund . . . ."); *id.* § 11.(c)(i) ("Except as otherwise provided in paragraph (ii), payment of benefits hereunder shall commence no later than the April 1 next following the later of the calendar year in which an individual attains age 70-1/2 or the calendar year in which the individual separates from service . . . ."). This is consistent with the letter that Mr. Johnson received in which he was offered "the opportunity to receive a distribution" from the ESOP. ECF No. 53-3.

with a majority of the members of the putative class and that Plaintiffs' counsel lack experience and competence to represent the class. Defs.' Opp'n 11–17. I address each argument in turn.

### 1.    Conflicts of Interest

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). A class representative must "possess the same interest and suffer the same injury as the class members." *Id.* at 625–26 (internal quotations omitted). But "perfect symmetry of interest is not required." *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012) (adding that "not every discrepancy among the interests of class members renders a putative class action untenable"). In assessing whether an intra-class conflict stymies class certification, I consider whether the conflict "go[es] to the heart of the litigation" or is "so substantial as to overbalance the common interests of the class members as a whole." *Id.* (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012)).

The Defendants assert that the named Plaintiffs, who are all former employees, cannot adequately represent a class that includes current employees of Maine Oxy because former employees lack a vested interest in the continued viability of the company. Defs' Opp'n. 11–13. While it makes sense that former employees may be more antagonistic to a company and thus their interests may not always be perfectly aligned with current employees, the Defendants point to no authority

stating that former employees can never adequately represent a class of current employees.

Here, there are two reasons why all participants in the ESOP—current and former Maine Oxy employees alike—have sufficiently aligned interests. First, the claim that this litigation will jeopardize Maine Oxy's viability as a company is largely unsupported. Mr. Guerin avers that the COVID-19 pandemic has resulted in declining sales and layoffs at Maine Oxy, but he fails to offer specifics about how deep the company's financial pain runs or how many employees have been laid off. Guerin Decl. ¶ 4. Such "[s]peculative conflict should be disregarded at the class certification stage." *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 4621777, at *12 (D. Mass. Oct. 16, 2017) (alteration and quotation marks omitted); *see In re First Am. Corp. ERISA Litig.*, 263 F.R.D. 549, 557–58 (C.D. Cal. 2009). The Defendants have offered no evidence to suggest that this litigation has the potential to bankrupt Maine Oxy or otherwise jeopardize jobs at the company.

Second, in terms of their prayer for relief, the Plaintiffs only seek equitable remedies narrowly tailored to the alleged harms flowing directly from the buyback.[4] SAC 26–27. Such harms would have been universally sustained by any participants in the buyback, regardless of any participant's current employment status. And there is little reason to believe that these remedial measures would cause collateral damage

---

[4]     In their supplemental briefing, the Plaintiffs have made clear that they are primarily seeking three remedies—1) a declaratory judgment that the Defendants breached their fiduciary duties, 2) compensation for any of the Plaintiffs' losses stemming from the buyback, and 3) disgorgement of any profits the Defendants received from the buyback. Pls.' Supp. Filing in Support of Mot. for Class Cert. 2–3 (ECF No. 63).

to current employees. For example, this is not a case where the putative class is seeking systemic changes to the company that might make current employees worse off, *see In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1064 (N.D. Cal. 2007) (finding that no conflict of interest existed where likely result of class action would be changes within the company that would benefit current employees), or punitive damages that would drain the company coffers, *see Littler v. Ohio Assoc. of Pub. Sch. Emps.*, No. 2:18-cv-1745, 2020 WL 1861646, at *8–10 (S.D. Ohio Apr. 14, 2020) (finding conflict of interest where class action against union for return of fees would be pursued by a putative class containing both pro-union and anti-union members, particularly where complaint sought punitive damages). Thus, on the record before me, there is no evidence that these former employees cannot adequately represent the class.

## 2.    Adequacy of Proposed Class Counsel

The Defendants maintain that Plaintiffs' counsel lack the experience to adequately represent the proposed class. Under Rule 23(a)(4), "[t]he moving party must show . . . that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). This inquiry is "designed to protect the interests of absentee class members." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 312 (3d Cir. 1998). In conducting this inquiry, I consider "the work counsel has done in identifying or investigating potential claims"; "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; "counsel's knowledge of the

applicable law"; and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i-iv).[5]

Plaintiffs' counsel are experienced attorneys who practice in federal court. Decl. of Thomas Douglas ("**Douglas Decl.**") (ECF No. 53-5); Decl. of Lauren Thomas ("**Thomas Decl.**") (ECF No. 53-6). Attorney Thomas Douglas is a 2003 graduate of the University of Pennsylvania Law School who has been admitted to practice law in Maine for fifteen years. Douglas Decl. ¶¶ 4–5. He is an experienced litigator in federal court and is admitted to practice in this Court. Douglas Decl. ¶¶ 4–5. Attorney Lauren Thomas has been admitted to practice law in Maine for thirteen years. Thomas Decl. ¶ 6. She worked for nationally-ranked law firms and has been admitted to practice in this Court for more than a decade. Thomas Decl. ¶¶ 4, 6.[6]

Plaintiffs' counsel point to their conduct in litigating this case as further evidence that they are qualified to represent the class. First, counsel collectively spent many years investigating the Plaintiffs' claims and developing this ERISA action. Douglas Decl. ¶ 2 (two years); Thomas Decl. ¶ 2 (fifteen months); Decl. of Jeffrey Russell ¶ 2 (ECF No. 53-7) (four years); *see* Fed. R. Civ. P. 23(g)(1)(A)(i). Next, despite not previously litigating an ERISA action, counsel appear to have successfully

---

[5]     Rule 23(g) also permits a court to "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

[6]     Attorney Jeffrey Russell graduated from Maine Law in 1992. Decl. of Jeffrey Russell ("**Russell Decl.**") ¶ 4 (ECF No. 53-7). He worked in the aviation industry for a decade but has otherwise practiced law in the state. Russell Decl. ¶ 4. Mr. Russell provided fewer details about his experience and concedes that much of his federal practice has been as "co-counsel or in support of named counsel." Russell Decl. ¶ 6. Mr. Russell has associated himself with sufficiently experienced attorneys to justify his continued participation as named counsel in this complex litigation.

drafted a complaint that states a claim under ERISA. *See* Fed. R. Civ. P. 23(g)(1)(A)(iii). The Defendants note that the Plaintiffs' initial Complaint requested punitive damages, which are not available under ERISA. Defs.' Opp'n 16–17. Upon receiving the Defendants' motion for judgment on the pleadings on the punitive damages request (ECF No. 21), the Plaintiffs filed the FAC rather than contesting a motion that they were sure to lose (ECF No. 25). Although Plaintiffs' counsel mistakenly sought a remedy that is not available under ERISA, their actions also show that they will judiciously litigate the Plaintiffs' claims, which will preserve judicial and class resources. Counsel's error in requesting punitive damages is not significant enough to prevent their appointment as class counsel in light of the Plaintiffs' success on this motion and their overall presentation of their claims. Finally, I note that Plaintiffs' counsel own or work at three separate law practices and have adequate resources to bring to this case. *See* Fed. R. Civ. P. 23(g)(1)(A)(iv).

Further, there is no evidence that Plaintiffs' counsel lack the professional integrity to represent the class. The cases that the Defendants rely on to argue that Plaintiffs' counsel should not be appointed class counsel are distinguishable because they involve both inexperienced and incompetent attorneys.[7] Here, Plaintiffs' counsel

---

[7]       For example, in their opposition to the class certification motion, Defendants cite *Santiago-Ramos v. Autoridad de Energía Eléctrica de Puerto Rico*. Defs.' Opp'n 13–14. But in that case, not only was counsel inexperienced, but the presiding judge pointed to a number of deficiencies in counsel's performance, as well as substantial criticisms of counsel's work product and character from other judges in the district. *See* No. CV 11-1987(JAG/SCC), 2014 WL 12726428, at *5 (D.P.R. Mar. 3, 2014). In their sur-reply, Defendants cite to *Sweet v. Pfizer*. Defs.' Sur-Reply in Opp'n to Pls.' Class Cert. Mot. ("**Defs.' Sur-Reply**") 6 (ECF No. 57). But that case, too, is dissimilar. In *Sweet*, the court found that proposed class counsel was not only inexperienced, but that their performance in the case "demonstrate[d] a failure to comply with the federal rules, and, more critically, apply federal legal principles when clearly applicable." 232 F.R.D. 360, 370 (C.D. Cal. 2005).

have adequately pursued Plaintiffs' claims, and the Defendants have not presented any reason to question their professional competence or integrity.

## II.    Rule 23(b)

Once plaintiffs seeking class certification have met the Rule 23(a) prerequisites, they must next show that they meet one of the requirements outlined by Rule 23(b). The Plaintiffs argue that their proposed class qualifies under each of the Rule 23(b) categories, although they point to Rule 23(b)(2) as being the best fit. Pls.' Supp. Brief 3–6. In my view, a Rule 23(b)(3) class best fits these facts, and because this class can be certified under Rule 23(b)(3), I do not closely examine whether the class could be certified under another provision.[8]

---

[8]    I see issues with certification under Rule 23(b)(1) and (2). Certification under Rule 23(b)(2) is appropriate where a plaintiff seeks injunctive or declaratory relief applicable to the class as a whole. Fed. R. Civ. P. 23(b)(2); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). Although the Plaintiffs nominally make a request for a declaratory judgment, SAC 26 (requesting that the Court "[d]eclare that Defendants have breached their fiduciary duties to the Class and/or knowingly participated in breaches of fiduciary duty"), this is essentially a request for a declaration of past liability that could be sought in any case. That is not enough to support a Rule 23(b)(2) class. *See Dukes*, 564 U.S. at 360 (holding that a class may not be certified under 23(b)(2) where any monetary relief sought is not incidental to any injunctive or declaratory relief); *cf. Green v. Mansour*, 474 U.S. 64, 73 (1985) (concluding that a declaratory judgment was "not available when the result would be a partial 'end run' around" the Eleventh Amendment prohibition against damages awards against state officers).

I also do not believe that the Plaintiffs' proposed class can be certified under Rule 23(b)(1)(A). A Rule 23(b)(1)(A) class is appropriate where, if the claims were to proceed individually, there is a risk of inconsistent adjudications "that would establish incompatible standards of conduct" for the defendant. Fed. R. Civ. P. 23(b)(1)(A). I do not see how inconsistent adjudications from individual actions could create compliance difficulties for the Defendants on these facts.

A Rule 23(b)(1)(B) class is appropriate where adjudications with respect to some individual class members, "as a practical matter, would be dispositive of the interests of the other members" of the putative class. Fed. R. Civ. P. 23(b)(1)(B). This rule, too, is inapplicable to these facts. If each plaintiff were to proceed against the Defendants individually, an unfavorable ruling against one plaintiff would not have a preclusive effect on any subsequent plaintiffs. *See Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971) (noting that due process prohibits estopping litigants who did not appear in a prior action from being able to litigate their claims).

A Rule 23(b)(3) class should be certified where 1) "questions of law or fact common to class members predominate" over any individualized questions (the "predominance" requirement) and 2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "superiority" requirement). Fed. R. Civ. P. 23(b)(3); *Amchem*, 521 U.S. at 615. The Defendants implicitly concede that common questions predominate here by failing to address the issue in their briefing. *See* Defs.' Supp. Opp'n 9–10. As the Plaintiffs emphasize, the Defendants are alleged to have taken actions that impacted the members of the putative class as a whole. Pls.' Mot. 13. The common questions regarding the Defendants' buyback predominate because the crux of the Plaintiffs' claims is that the Defendants allegedly bought back the ESOP shares of the members of the putative class at the same below-market rate in a manner that breached their fiduciary duties to all of the putative class members.

The Defendants focus their attack on the superiority requirement, arguing that a related case is a superior way to adjudicate this controversy. Defs.' Supp. Opp'n 9. Approximately seventeen months after the Plaintiffs filed their Complaint in this action, in September 2020, the Secretary of the United States Department of Labor (the "**DOL**" or the "**Secretary**") filed a substantially similar case against the three defendants in this action (as well as a fourth) alleging similar violations of ERISA as are alleged in the SAC (the "**DOL Action**"). *See Scalia v. Maine Oxy-Acetylene Supply Co.*, No. 2:20-CV-326-NT, ECF No. 1 (D. Me. Sept. 15, 2020). The Defendants allege that the DOL Action "conclusively resolve[s] any doubts about superiority" because

"[i]f a class is certified, the Plaintiffs and the DOL will (a) litigate the same facts, (b) argue the same claims, and (c) seek the same alleged damages, for (d) the benefit of the same individuals." Defs.' Supp. Opp'n 9–10 (emphasis deleted). The Defendants cite no law in support of this position, and, in my view, it suffers from a number of flaws.

To begin with, declining to certify the class does not preclude each of the putative class members from pursuing their cases individually, regardless of the DOL Action. And any plaintiffs who pursue their cases individually will each litigate the same facts, argue the same claims, and seek the same damages. The Defendants' proposed remedy—to decline to certify the class—would not streamline this litigation and even has the potential to magnify the Defendants' concern for overlapping litigation. Moreover, Federal Rule of Civil Procedure 42 gives me discretion to consolidate cases, in whole or in part, if they "involve a common question of law or fact." Fed. R. Civ. P. 42(a). Thus, the Plaintiffs' class action could be consolidated with the DOL Action in order to avoid any concerns about duplicative efforts.

The Defendants also assume, without support, that the DOL Action is necessarily superior to the proposed class action. There is no information in the record about the experience of counsel representing the Secretary or the extent of the Secretary's investigation, and without this information, it is difficult to say whether the DOL Action truly is a superior one.

Nor do the Defendants offer any evidence that the Secretary agrees that his action is superior. The Secretary has not, for example, lodged any objection to the

certification of the class, and in the past, the DOL has "strenuously object[ed]" to the idea that its pursuit of ERISA action should presumptively usurp a private class action. *See In re Beacon Assocs. Litig.*, No. 09 Civ. 777(LBS)(AJP), 2012 WL 1569827, at \*12 (S.D.N.Y. May 3, 2012). In *In re Beacon Associates Litigation*, the Secretary argued "that a general rule[] prohibiting the certification of Rule 23(b)(3) classes whenever there is a parallel government suit would undermine ERISA's private enforcement mechanisms and impede the Secretary's exercise of her prosecutorial discretion and her ability to enforce ERISA." *Id.* (internal quotations omitted); *cf. Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146–47 (1985) (noting "[t]he six carefully integrated civil enforcement provisions found in § 502(a)" that form a part of "ERISA's interlocking, interrelated, and interdependent remedial scheme" and demonstrating "reluctan[ce] to tamper with an enforcement scheme crafted with such evident care"). In particular, the Secretary noted that it would "prevent[] the DOL from being able to coordinate its enforcement efforts with private class counsel—who, as the Secretary points out, are likely to be far better able of representing the interests of the class as a whole than would the multiple plaintiffs' attorneys with whom the DOL would otherwise have to coordinate." *In re Beacon*, 2012 WL 1569827, at \*12. The Secretary was also concerned that allowing a DOL lawsuit to preempt a private class action could also "establish a rush to judgment among private plaintiffs, anxious to be certified before the DOL files its suit, thereby further hampering coordination between private parties and the DOL." *Id.* Given these concerns, the *In re Beacon* court saw no reason why the parallel DOL action should preclude

20

certification and certified a Rule 23(b)(3) class. *See id.* at \*12–14; *cf. Atakhanova v. Home Family Care, Inc.*, 16-CV-6707(KAM)(RML), 2020 WL 4207437, at \*9–11 (E.D.N.Y. July 22, 2020) (certifying a 23(b)(3) class after concluding that there was "no particular reason" why a parallel New York Department of Labor administrative proceeding "would be a superior means of adjudicating the claims" in the plaintiffs' proposed class action). I agree with this analysis.

One additional component of a class action contributes to my conclusion that the DOL Action is not superior to the proposed class action. The settlement (or dismissal) of a class action requires court approval. Fed. R. Civ. P. 23(e). Court approval is necessary to "protect[] unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise." *Amchem*, 521 U.S. at 623 (internal quotations omitted); *see Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 5 (1st Cir. 1999) ("Rule 23(e) requires judicial approval of class action settlements to guard against possible ineffective representation of absentees' interests by the representative parties." (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1139 (7th Cir. 1979)). This protection does not exist in the context of an action brought by the DOL.

For these reasons, I conclude that the existence of the DOL Action does not render a 23(b)(3) class action an inferior method of adjudicating this case. Seeing no other reason why the Plaintiffs' proposed class does not satisfy the superiority

requirement, I conclude that a Rule 23(b)(3) class should be certified consisting of the following: All Maine Oxy employees who participated in the company ESOP and who sold their shares back to Maine Oxy after the Albistons sold their 51% interest in the company.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiffs' motion for class certification (ECF No. 38).


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 5th day of November, 2020.